Our first case this morning is BANKS v. United States. Mr. Pratt? Good morning, Your Honor. Good morning. May it please the Court. I represent 37 individuals who owned or owned property along Lake Michigan in southwest Michigan. This is our second visit to this court. The claims court's second dismissal of these consolidated actions on jurisdictional grounds must be reversed. It seems like she's saying from 1903 to 1952, somebody should have noticed there was a problem. What's wrong with that? What's wrong with that is that nobody did notice that there was a problem, including the United States government. The evidence is uncontested that until after World War II, the scientific community, much less these late plaintiffs, had no idea what the jetties were doing and the effects that they were having on the littoral drift. And it wasn't until then that they even began studying it. And the evidence is also uncontested. It wasn't until really the 1960s that they actually began to understand why the jetties were doing what they were doing and the effects that they were having on properties down drift from the jetties. Am I correct in reading Judge Hewitt to not really be relying on anything that happened in the 70 to 90 period when there were mitigation efforts underway? I think what Judge Hewitt was trying to say was that your claim was already gone by the time mitigation started. So it was the 58 was the date she picked. She went back six years. And then otherwise you're gone. And the notion that these plaintiffs should have known back in 1950. First, let's be clear. We're talking about hypothetical plaintiffs because these plaintiffs didn't own property back in 1950. The hypothetical plaintiffs should have known that these jetties were causing erosion to their property four miles down drift from where the jetties were. There's just no evidence for that. The evidence is all to the contrary. Nobody knew, much less these lay plaintiffs. My understanding is that Judge Hewitt made findings of the fact that there was greater erosion sort of north of this property, closer to the jetties than there was south of the property, or something to that effect. From that, she drew the conclusion that these property owners should have known that the erosion was due at least in part to the jetties and not an actual phenomenon. But to me, there's a bit of a disconnect there. Were there any findings of fact with respect to these individual property owners as to what they individually knew or any basis to conclude what they should have known? No, there was not. And it's worse than that. The way the science now understands the way the jetties worked, back in 1903, they may have started blocking sand, but we're four miles down. And it's uncontested that it's a very slow process. So the property immediately south of the jetties begins to suffer. Then it moves down. Then it moves down. Then it moves down. The scientists, they couldn't even determine when it hit our property until 1992. It was the first time that the scientists said, you know what? It's actually reached that far. In 1970, there's a government report where they say in the report, we're still background. We're natural erosion. The jetties haven't affected you yet. It turns out they were mistaken. And in 1992, a report showed that they were mistaken. But for us, these lay plans to understand and know what the government itself and the scientists don't know, it's just untimely. At some point in the record, it talks about a foot a year, or there's actually quantification put on this that suggests that that would have had to have been noticeable, right? Well, the problem with the quantification is that it's very deceptive. The way erosion works on Lake Michigan, it's not like the ocean. It's very episodic. And it's much tied to lake levels. And on Lake Michigan, the levels go up. They'll go down. And it's up and down. And erosion occurs when the lake levels are high. And there's strong winds. And it's very episodic. So these foot a year is an average. What causes the lake to go up and down that much? Well, the scientists knew that they would be able to predict where it's going. It's been 20 years since they've had a high lake level. It's tied to precipitation. Some think global warming is affecting things. They don't really understand what causes the lake levels to go up or down. But my point is that it's episodic. So that the one year, excuse me, the one foot, that's just an average, averaging over 20 years or whatever average they've taken. But at any given year, you may have no erosion. You may actually have precipitation. It's just the cumulative effect over time is where you get the once a year or one foot a year average. I want to give you a chance to respond to something. Because at page 40 of the red brief, Appley contends waiver, citing CFC. Saying that CFC held it. Thanks. And I'm reading from it. Waived any accrual suspension defense by failing to raise it in his opening brief. And then ellipses. You therefore can't raise it now. So I'd like a response. Just so it's clear. Accrual suspension is like a third reason why the judge is wrong. But let me address that. If you look at our opening brief, we didn't use the word accrual suspension. But we make both arguments. We argue, one, that these plaintiffs, you know, the standard is knew or should have known. That there's no evidence that they knew or should have known back prior to 1952. That the jetties were causing erosion to their property. We argue that in the brief. We didn't use the word accrual suspension. But the law and waiver is very clear. It's whether you've made the argument, not whether you've used the right label. We also raised the legal rights argument in our opening brief. And by that I mean it's our position that prior to Owen in 1988, the law had been crystal clear that plaintiffs like us, who are indirectly impacted by a navigational structure, don't have a takings claim. And it wasn't until Owen overruled that law that a claim was now available. So our position is that you cannot have an accrued claim until you actually have a claim. And that couldn't possibly have occurred until 1988. We didn't waive either of those arguments. What the judge did with the mandate, the judge usually would do with the mandate, is she basically defied it. If you look at the opinion from 2003, it says without mystery, without any kind of ambiguity, these claims are not time-barred. What the government would do is they would take an allegation from a plaintiff's complaint dealing with the steel cladding of the jetties and suggest that that somehow was integral to your decision. The government basically said, if I'm not mistaken, that for purposes of the motion, the 12B1 motion at the time, they would accept as correct the pleading in the amended complaint that the erosion began in 1950 when the steel cladding was applied. But if you look at the government's motion, they made two arguments. One is that even if we assume they're correct, no stabilization. But they also said they're not correct and there's no stabilization. And in fact, they put in evidence to show that the jetties started impacting the shoreline prior to 1950. But the determination at the Court of Federal Claims the first time around was focused on really the mitigation and what was going on in the 70s. There's no question that that was an important factor in delaying stabilization. Not merely important, that was the factor that was discussed, was it? It was the factor that was discussed. And then the appeal was focused on that issue. On the mitigation, that's correct. And it's still important to the case. That hasn't changed. The question is, when did the stabilization become permanent? And because of the mitigation, it didn't become permanent until 2000. What I'm suggesting is that there's no way this court accepted as true an allegation in a complaint where all the evidence was to the contrary. Under this court's jurisprudence, jurisdictional facts are not accepted as true if they're contested by the government. These facts were contested by the government. All of the evidence was to the contrary. I don't believe for a second that the court accepted as true something that was not true. So I don't believe it was integral to your decision at all and that the mandate is clear that the claims are not time-barred and that the court was trying to do an end-run around your decision. I would also argue that she once again misunderstood Dickinson and Applegate. Dickinson says that you're to avoid procedural rigidities. You're to focus on fairness. And charging these plaintiffs with knowledge of a fact, scientific fact, that scientists didn't even know, is blatantly unfair. Under Applegate, we're Applegate Plus. Not only do we have the imperceptible, very gradual erosion. We have a promise starting in 1958. But more than that, we have the actual program that went on for 25 years. We also have natural erosion. If you recall in Applegate, prior to the jetties going in in Florida, that area was actually a treaty. So they didn't even have natural erosion. We've got natural erosion. That definitely muddies the picture in terms of, again, we're talking about uncertainty. When should these plaintiffs have known that there was a permanent taking of their property due to the jetties? I submit that there's no way they could have known until the mitigation program was declared by the government, by their admission, to be unsuccessful, and that was in the year 2000. So that your honors had it right the first time that these claims are not time-barred. In conclusion, because I'm reserving time for rebuttals, the court had no power to overturn your prior decision. These claims are not time-barred, and the trial court's decision dismissing on jurisdictional grounds a second time should be reversed. As a matter of policy, wouldn't the effect of this decision be to make sure the government never makes admissions like it made in the reports you're referring to? They admit finally, okay, well, we can't mitigate this, this problem that we may have created. They'll never do that again, will they? Well, I would like to believe that the government will do the right thing, and when they've caused a problem, they'll investigate it and try to fix it. That's what I would like my government to do. Fair speaking. Thank you. Ms. Peterson? May it please the Court, my name is Elizabeth Peterson. I'm here on behalf of the United States. The trial court did not violate this court's 2003 mandate by finding that on the record in front of it, after two trials. Ms. Peterson, on page 33 of the red brief, you write, but the issue of uncertainty as to whether the jetties, as originally constructed prior to refurbishment, had caused erosion of the plane's property, contrary to the allegation of the plane, and whether the mitigation undertaken in the 1970s extended any such uncertainty, was neither presented nor considered in the earlier appeal because of the procedural posture of the decision then on the appeal. Wasn't the Court of Claims aware of the 1903 date? Oh, absolutely, Your Honor. Everyone was aware of that, and there was, in fact, evidence that there was erosion occurring that may have been attributable to the jetties before 1950. But the amended complaint clearly argues that the last government action leading to the damage for which they sought compensation was the steel encasement project that began in 1950 and went on until 1989. In fact, in this court, their brief heading is that their claim for compensation from the steel cladding project did not accrue until the 1990s. So the question before both courts at that time was whether, given that the last action relevant to the damage, the injury to these plaintiffs, took place over the period from 1950 until 1989, whether it accrued when that action was completed or whether the stabilization doctrine caused that date to be extended because of the mitigation project. On remand, the plaintiffs claimed damages, claimed compensation back to 1950, and put in evidence of their injury during the period prior to 1950. In other words, put in evidence that they had already seen erosion to their properties by 1950. And among the evidence that they put in was a 1958 study that showed not only that erosion had been occurring in this area of the lake, but also that the Corps was considering the possibility that restoration of the littoral flow along the lake shore might mitigate that damage. So that changed the entire picture, as the Court of Federal Claims found, because that meant that in conjunction with evidence that the jetties had been completely impermeable before they were ever plowed in steel. Let me ask you a policy question. And I expect a square answer from the government on anything, really. Supposing we find that the court below violated our mandate, other than reversal, what are our remedies? I don't understand the question. Your Honor, the question in front of you is whether the court properly concluded that it lacked jurisdiction. You can reverse that, and the court's jurisdiction then would have to be added. What other direction? The court didn't just make that determination. It also provided us with what looks a lot like an advisory opinion if, in fact, it violated the mandate. What do we do with that? Ignore it? I mean, the government seems to think so. Well, this court certainly is not, at this time, in a position to consider any challenge to those findings and conclusions because they didn't reach an ultimate judgment. The court found that there may be compensation due to five property owners and additional compensation for some structures, but held that there would be some additional evidence in the record identified in order for a computation of those damages to be made. So we, hypothetically, if we found a violation of the mandate, we reverse, we send it back down, but it's not the same judge anymore. The judge's opinion clearly shows what the court that made all those extensive findings and conclusions over the course of two trials believes was left. It also concluded that the evidence put into the record of those trials, along with multiple motions, was more than adequate to complete the consideration of this case. So the remand in this case is more or less laid out in the Court of Federal Claims' opinion, should this court disagree with her conclusion. So what you're saying, if we go that way, we should instruct the Court of Federal Claims to enter judgment based upon those findings? This court is certainly free to do so. I do not believe that a ruling simply reversing the actual judgment of the Court of Federal Claims would be different from that, because the findings and conclusions of the court below on a vast evidentiary record have all been made, and she made clear, that trial judge that you said is no longer serving, made clear that it would not be necessary for additional evidence. So supposing we're disturbed by that, and disturbed by the government's position right now, should we try and save some institutional efficiency by sending direction down the other way? On that question, Your Honor, the government does not have a position. I believe the Court of Federal Claims made very clear what that court, hearing all the evidence in this case, thought was appropriate in order to reach a final conclusion on that evidence, but concluded based on that evidence that the court lacked jurisdiction. Obviously, the government's view would be that that court was the best judge of what was necessary to adjudicate those claims. If this court would like to remand for further proceedings, it certainly has the power to do so. We do not believe that would be appropriate. Ms. Peterson, assuming that you're correct and that the Court of Federal Claims did not violate the mandate rule, don't you still have a problem with any findings as to what these property owners or their predecessors entitled knew or should have known with respect to this damage? Well, under the stabilization doctrine, where property has been substantially encroached and there is reasonable certainty that the encroachment will be permanent, the landowner's claim accrues. The Court of Federal Claims found, based on the 1958 report, along with evidence that there had been no change in the rate of erosion or the disruption of lateral flow between 1903 and the date on which these complaints were filed, that the claims therefore stabilized. But how would these property owners have known that the damage that occurred was due to the jetties and not due to natural forces? And let me throw in, at the same time, wasn't there conflicting evidence? Answer, Judge Lindberg, keep that in mind. The Court of Federal Claims found that the 1958 report was the most persuasive evidence of situations prior to that date and that the most persuasive evidence was that it was well known that erosion was occurring. It was well known that the jetties might be causing it and the United States had already proposed by 1958 that that could possibly be mitigated. Well known by who? By the property owners, by observation of the land, that there was great concern about erosion, both natural and jetty caused, in this region and that it clearly had reached this area by that time. Is there anything in the record that shows that? On a site-specific basis as well, which is, I think, another requirement of the law? The Court found that the 1958 report obviously did suggest those properties and was the most persuasive evidence that these properties had been substantially approached before 1950 and that it was well known  and that these landowners, therefore, were on inquiry notice of their claims no later than 1950. Now, that is in part, that finding in part rests on plaintiff's successful proof that they were entitled to damages back to 1950. So the Court was thrown back on the law of the case, which was that there had been substantial erosion of these properties by 1950. Adding to that the evidence in the 1958 report that the government believed that restoration of the literal flow might mitigate the kind of erosion that was occurring and the very erosion that was occurring on neighboring properties gave the Court confidence that it was well known that the jetties were the cause of some portion and that the plaintiffs, therefore, were on inquiry notice of their claims no later than 1950. So that is supported on the record. And so the banks have not challenged the factual finding as clearly erroneous. They just claim that there is no evidence and the Court found to the contrary that there is evidence and that it is evidence that they presented in the 1958 report when they put that into the record on remit. So it is our position that the Court correctly concluded that the claims stabilized before 1950. With regard to the claim accrual doctrine, that doctrine applies assuming it was not waived in this case, only where a plaintiff is unaware of his injury because it is unknowable. Where the injury is unknowable or is hidden by the defendant, the claim will be suspended. In this case, it wasn't the injury that Bank's claim was unknown. It is the complex nature of a claim for compensation for that injury that remains unknowable. And that is not the rule. The rule is that the facts underlying the claim have to be known. And that is what the Court of Federal Claims concluded has occurred based on the 1958 study. And with respect to the challenges to the merits, I believe this Court's precedents are clear that the only issue for the Court is the issue on which judgment was entered. And that's the jurisdictional issue in this case. So if there are no further questions. I'm disturbed by Mr. Burgoyne's testimony, the government's appraisal expert, who basically says, as long as you can build on this property, it doesn't matter how much you lose when I'm appraising and evaluating the property. Does the government stand by that? What Mr. Burgoyne did in this case was to evaluate the property according to standard property assessment practices that are the normal means of determining damages where property is. I can't tell you the number of government expert appraisers I cross-examined as a lawyer. You've got to tell me more than that. Well, his appraisals showed that using comparables, Mr. Burgoyne found that where the beach was eroded, it did not affect the value of the property so long as the property remained buildable for a structure, a house. And that's simply what he found. His practices were standard practices and have not been challenged. The only evidence that the plaintiffs put in a value was a notion that by issuing reports stating that mitigation was unsuccessful, the court had precipitated an enormous drop in value of the property, which, of course, had actually appreciated during this entire period. They're worth a great deal more now than they were prior to it. The question is, are they worth what they would have been worth? Is that the question, though? The question is whether they lost value as a consequence of the erosion. And what the conclusion of the appraiser was is that the erosion did not significantly enough affect the value of the property to a buyer that they lost. Well, let's take it the other way. Supposing somebody wants to buy some beachfront property from the government. The government's position is that, hey, whether the beachfront is 200 meters wide or one meter wide doesn't affect the value of the property. Can we say that the public can rely on that? The government would have to have evidence that that's true. But it's market evidence that drives those conclusions, Your Honor. And in this case, Mr. Burgoyne did the standard method of comparing value before and after and concluded that the effect of erosion of some of the beachfront did not change what individuals were willing to pay for that property. And therefore, the depth of the beachfront did not drive the value of the property, which continued to appreciate it just like any other property in the area. If there are no further questions. Thank you, Ms. Peterson. Federal Claimant, please. Mr. Spratt. Thank you. Very briefly. First, I'd like to address Mr. Burgoyne's appraisal because it's always troubled me about this. What he's basically saying is if the government came onto my property and took a steam shovel and took the sand and sold it, I don't get any damages. They get to take my property away. As long as your property's market value is the same. Right. That can't be right. As far as the 1958 report, the government keeps saying it hurts us. It helps us. It's the first time anybody understood or acknowledged that there may be a problem with the jetties causing erosion down drift. So at that point, the government is promising to implement a plan, fire or whatever. The cost-benefit analysis in that report almost suggests that they wouldn't undertake mitigation, right? No, they actually talked about the benefits of doing mitigation. And they were focused on the property. And the costs as well. Right. But they were focused on the property closest to the jetties, not our property. In fact, if you look at that report, they said that they only looked at our properties generally. There was no specific study of any particular property. And they didn't say that the jetties were causing erosion that far down drift. They just said that they noticed that there was some erosion. The only one that there was some erosion is natural erosion. They never made that connection. And in 1973, you have the government saying that it hadn't reached our properties. So the idea that the 58 report hurts us is misplaced. It helps us. And it sets the trigger for all the subsequent mitigation. And it prevented the permanence. And it prevented stabilization until 2000. I'd also like to briefly address the other. What do we do if this court finds that its mandate was violated and reverses the jurisdiction? I think one thing has to happen. The motion in Lemonnier that we brought, where the judge, on a second basis, didn't follow the mandate. If you recall in the decision, this court found that because the government admitted that the erosion was permanent and irreversible, the claim didn't stabilize in 2000. Well, we get down to the lower court. And all of a sudden, the government's arguing, no, it's not permanent. It's totally irreversible. In fact, we've reversed it. And I submit that that's contrary to the jurisdictional facts that this court found. And the motion in Lemonnier should have been granted. So that if there is a reversal, that issue as well has to be reversed. And then as far as what happens, there's a new judge. The new judge will decide whether there's a whole record, there's transcripts. The judge can decide whether to adopt or not, adopt the other findings of the court. And parties will have an opportunity to address that to the court. And we'll go from there. If there's no other questions.  Thank you, Mr. Pratt.